# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| v. | Case No. |
| **$24,600 IN UNITED STATES CURRENCY,** | |
| Defendant. | |

## COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, by its attorneys, Teresa A. Moore, Acting United States Attorney for the Western District of Missouri, and Mary Kate Butterfield, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1. This is an action to forfeit property to the United States for violations of 21 U.S.C. § 881(a)(6).

## THE DEFENDANT *IN REM*

2. The defendant $24,600 in United States currency was seized on September 9, 2019, at the Greyhound Bus terminal, located at 1101 Troost Avenue, Kansas City, Missouri. It is presently in the custody of the United States Marshals Service in the Western District of Missouri.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action

for forfeiture under 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action under 21 U.S.C. § 881(a)(6).

4. This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1355(b)(1)(B), incorporating 28 U.S.C. § 1395, because the defendant property is found in this district.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1395, because the action accrued in this district and the defendant property is found in this district.

## BASIS FOR FORFEITURE

6. The defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished and intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; 2) proceeds traceable to such an exchange; or 3) money, negotiable instruments, and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

## FACTS

7. On September 9, 2019, Kansas City, Missouri Police Department (KCPD) Detective Lanaman and other members of the Missouri Western Interdiction and Narcotics (MoWIN) Drug Task Force, conducted

2

Case 4:21-cv-00200-GAF   Document 1   Filed 03/29/21   Page 2 of 13

interdiction duties at the Greyhound Bus terminal located at 1101 Troost Avenue, Kansas City, Jackson County, Missouri. These duties involved observing passengers arriving on a bus that originated in New York, New York and would terminate in Los Angeles, California.

8. At approximately 12:15 p.m., Detective Lanaman observed a male who was pacing throughout the terminal and looking around as though he was checking to see if he was being followed.

9. Detective Lanaman observed the male, who was carrying a small black gym bag, walk away from an area where other detectives were conducting consensual contacts with passengers from the same bus.

10. The male kept the black gym bag in his hands at all times as he moved through the terminal, even when purchasing something to drink, despite the fact that putting the bag on the ground would have made it easier to access his wallet.

11. The male then returned to the seating area in the terminal and sat down. Detective Lanaman again observed the male look around and behind him as though he was checking to see if he was being followed.

12. Detective Lanaman approached the male, introduced himself as a police officer and explained that he was speaking with passengers regarding their travel. Detective Lanaman asked the male if he was willing to speak to him and the male agreed.

3

13. Detective Lanaman asked the male if he was traveling for business or pleasure, and the male said that he was returning from Pennsylvania where he had visited a sick friend.

14. The male provided Detective Lanaman with a copy of his bus ticket, which indicated he was traveling from Pennsylvania to California. The passenger name listed on the ticket was Ivan Sierra.

15. When asked by Detective Lanaman for identification, the male provided a California driver's license that positively identified him as Ivan Cordova-Sierra (Cordova-Sierra).

16. Detective Lanaman asked Cordova-Sierra if he was carrying any narcotics, weapons, money or other proceeds from the illegal trafficking of drugs. Cordova-Sierra stated he was not and offered Detective Lanaman the opportunity to search his bag.

17. Detective Lanaman then followed up and confirmed that Cordova-Sierra was giving consent to search the gym bag. Cordova-Sierra responded, "Sure, go ahead."

18. While searching the gym bag, Detective Lanaman observed a white plastic bag containing what appeared to be United States currency. When asked by Detective Lanaman how much money the bag contained, Cordova-Sierra stated, "$5,000, it's a lot of twenties."

19. Detective Lanaman suggested to Cordova-Sierra that they go to a more secluded area of the bus terminal so that other passengers would not be aware he was carrying that much cash.

20. Cordova-Sierra agreed and followed Detective Lanaman into the customer service area to continue the conversation. Detective Lanaman removed the plastic bag containing the United States currency from the gym bag. Detective Lanaman observed the currency inside was banded together with rubber bands.

21. The banding of currency together with rubber bands in this manner is consistent with packaging of drug proceeds by traffickers for transfer via courier.

22. Due to the size of the bundles, Detective Lanaman told Cordova-Sierra that the bundles appeared to contain more than $5,000. Cordova-Sierra stated, "it's actually $24,600." When asked by Detective Lanaman why he lied about the amount of cash, Cordova-Sierra responded, "I'm not sure."

23. Detective Lanaman told Cordova-Sierra that he was concerned about Cordova-Sierra's behavior and believed the currency was being transported back to Los Angeles as money gained from the sale of drugs.

24. Cordova-Sierra responded that the money was originally for the purchase of a car in Pennsylvania but that he did not end up buying a car.

5

When asked by Detective Lanaman why he did not mention the purchase of a car when the currency was first discovered, Cordova-Sierra did not respond.

25. Detective Lanaman advised Cordova-Sierra that he could have a drug-detecting canine sniff the gym bag containing the currency. Cordova-Sierra responded, "Sure. Ok."

26. Detective Lanaman requested Detective Acton and his canine Bennett respond and conduct a sniff check of the currency. Detective Acton transported the black gym bag to the luggage holding area inside the Greyhound terminal. Once there, he placed the black gym bag with other unrelated baggage.

27. Detective Acton then responded with Canine Bennett and conducted a sniff check of all the luggage in the area.

28. Canine Bennett alerted to the odor of narcotics coming from or about Cordova-Sierra's black gym bag.

29. Canine Bennett is a 10-year-old Labrador Retriever who was certified most recently in April 2019 by the National Police Canine Association. Bennett is certified to alert to the odor of cocaine, marijuana, methamphetamine, and heroin.

30. Canine Bennett has assisted in the seizure of 1,012.87 pounds of Marijuana, 83.93 pounds of Methamphetamine, 31.95 pounds of Cocaine, 1.42 pounds of Heroin, 2,633 units of Ecstasy, 1.1 gallons of PCP, and $436,628 in United States currency.

6

31.     Detective Lanaman then asked Cordova-Sierra multiple question about his employment. Cordova-Sierra stated that he worked for his brother-in-law doing landscaping.

32.     When pressed by Detective Lanaman for the name of the company to verify tax records, Cordova-Sierra responded that he was working under the table for his brother-in-law, whom he identified as Adrian Guillen. Cordova-Sierra further informed Detective Lanaman that he only worked for Guillen when he needed money.

33.     Based on Cordova-Sierra's deceit regarding the currency and the canine alert to odor of illegal drugs on or about the currency, Detective Lanaman told Cordova-Sierra he was not under arrest but that the currency was being seized.

34.     Cordova-Sierra told Detective Lanaman that he did not want to miss his bus and was going to leave. Detective Lanaman then asked Cordova-Sierra if he had any questions and Cordova-Sierra responded, "Nope," and then calmly walked out of the customer service area and into the line to re-board the bus.

35.     The official count of the United States currency seized from Cordova-Sierra's gym bag was $24,600.

## Money Laundering Investigation

36.     During the post-seizure investigation, KCPD Detective Arthur Willingham, who is a Task Force Officer (TFO) with the Drug Enforcement

7

Administration (DEA), learned that Cordova-Sierra was suspected of participating in an organized money laundering ring involving The Check Cashing Place, Incorporated, a southern California money service business.

37. R&L Management Company, Incorporated (R&L) provides management services, including compliance operations, to various businesses, including The Check Cashing Place.

38. Rob McDonald, an employee of R&L, informed TFO Willingham that R&L uncovered a money laundering scheme involving Cordova-Sierra and six other individuals, all of whom were residents of Inglewood, California.

39. A Customer Service Representative (CSR) employed by The Check Cashing Place was central to the scheme and helped multiple individuals, including Cordova-Sierra, transfer money to Culiacan, Sinaloa, Mexico.

40. Information provided by R&L revealed that the CSR helped participants of the scheme send multiple money transfers on the same date, pushing the total amount sent above the $10,000 Bank Secrecy Act (BSA) reporting requirement.

41. The frequency and amount of the transactions indicates that the money transfers were structured to avoid detection by law enforcement and avoid triggering the $10,000 reporting requirement. R&L believed that

because the money transfers were directed to the Sinaloa Region of Mexico, they were most likely related to a drug cartel.

42. The Sinaloa Cartel, as evidenced by its name, operates out of the Mexican state of Sinaloa. The cartel is involved in international drug trafficking and money laundering and employs many different methods of laundering proceeds. Among these methods is utilizing banks and money couriers to funnel funds from the purchase of illegal drugs back to Mexico.

43. The CSR was terminated on July 15, 2019. Her inability to facilitate money transfers may have made it necessary for the involved parties to switch to other money laundering methods, such as cash couriers, which is consistent with Cordova-Sierra travelling with bulk cash from the east coast of the United States to Los Angeles, California.

<u>Cordova-Sierra's Purported Brother-in-Law</u>

44. Subsequent investigation into Cordova-Sierra revealed that Cordova-Sierra and Guillen, his purported brother-in-law, have the same address in Inglewood, California.

45. In addition, it was discovered that on August 25, 2019, Guillen withdrew a total of $15,980 from three separate Bank of America accounts.

46. This withdrawal activity is consistent with money movement through funnel accounts where, close in time, a single person withdraws funneled funds from multiple accounts.

47. The funds are usually withdrawn in states close to the United States border with Mexico. The funds are subsequently directed to Mexico by other means.

48. The California Secretary of State has no record of Guillen ever owning any legitimate, registered business in California. This is inconsistent with Cordova-Sierra's story that Guillen operated a landscaping business.

49. On September 12, 2019, the Jackson County, Missouri Prosecutor's Office was advised of the seizure and declined filing a forfeiture action related to the $24,600.

50. DEA initiated administrative forfeiture for the currency seized from Cordova-Sierra pursuant to 21 U.S.C. § 881. Cordova-Sierra filed a claim and the matter was referred to the U.S. Attorney's Office for the Western District of Missouri.

51. In Cordova-Sierra's claim, he now states that the $24,600 consisted of his own personal savings, as well as money borrowed from family members.

52. Cordova-Sierra further claims that he has no documentation for the cash at issue because, "I live with my parents so I had my savings and I had asked family members for personal loans witch [sic] I would like to pay back."

53. At no point during the encounter with Detective Lanaman did Cordova-Sierra mention that he had borrowed the money in question from family members and that he wished to pay them back.

54. Rather, Cordova-Sierra first lied about the amount of cash in his bag and later said the cash was intended for the purchase of a car.

55. In Cordova-Sierra's claim, he does not mention anything about purchasing a car.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

56. The Plaintiff repeats and incorporates by reference the paragraphs above.

57. By the foregoing and other acts, defendant $24,600 in United States currency constitutes moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in in violation of 21 U.S.C. § 801, *et seq.*, and therefore, is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

### SECOND CLAIM FOR RELIEF

58. The Plaintiff repeats and incorporates by reference the paragraphs above.

59. By the foregoing and other acts, defendant $24,600 in United States currency constitutes proceeds traceable to an exchange of moneys, negotiable instruments, securities, or other things of value furnished or

intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. § 801, *et seq.*, and therefore, is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

THIRD CLAIM FOR RELIEF

60. The Plaintiff repeats and incorporates by reference the paragraphs above.

61. By the foregoing and other acts, defendant $24,600 in United States currency constitutes moneys, negotiable instruments, securities, or other things of value used or intended to be used to facilitate any violation of 21 U.S.C. § 801, *et seq.*, and therefore, is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE the United States prays that the defendant property be forfeited to the United States, that the plaintiff be awarded its costs and disbursements in this action, and for such other and further relief as the Court deems proper and just.

Respectfully submitted,

Teresa A. Moore
Acting United States Attorney

By  MARY BUTTERFIELD
Digitally signed by MARY BUTTERFIELD
Date: 2021.03.29 09:18:39 -05'00'

Mary Kate Butterfield
Assistant United States Attorney
400 E. 9th Street, Fifth Floor
Kansas City, Missouri 64106
Telephone: (816) 426-3122
E-mail: Mary.Kate.Butterfield@usdoj.gov

# VERIFICATION

I, Task Force Office, Arthur Willingham, hereby verify and declare under penalty of perjury that I am a Task Force Officer with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the factual matters contained in paragraphs seven through 55 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Task Force Officer of the Drug Enforcement Administration.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated 3/29/2021

*/s/ Arthur Willingham*
Arthur Willingham
Task Force Officer
Drug Enforcement Administration